**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| SERGIO ROJAS, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 10-cv-05260 |
| v. | ) ) ) | Hon. Virginia M. Kendall |
| CAREER EDUCATION CORPORATION, a Delaware Corporation. | ) ) ) | |
| *Defendant*. | ) ) | |

**PLAINTIFF'S UNCONTESTED MOTION & MEMORANDUM IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

The increasing popularity of text messaging as a means of personal communication has necessarily given rise to text message marketing and advertising.[1] However, while some consumers voluntarily solicit or agree to receive text message advertisements, a large swath of consumers—69% according to a recent study—have reported receiving unsolicited text message advertisements.[2] This litigation and the instant Settlement are products of this evolving mobile advertising ecosystem and involve allegations that Career Education Corporation ("Defendant" or "CEC") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA"), when it caused the transmission of allegedly unsolicited text messages promoting its educational services to the cellular phones of consumers nationwide. (Dkt. 1.) Now, after more than two years of at times contentious litigation in two separate but related cases, and having participated in three mediation sessions with the Honorable Wayne R. Andersen (Ret.), the Parties now seek final approval pursuant to Federal Rule of Civil Procedure 23(e).

---

[1] Also known as "SMS," or "Short Message Service," text messaging allows cellular telephones to send and receive short text messages, usually limited to 160 or so characters, on their cellular telephones.

[2] Although not all text message marketing runs afoul of the law, a recent study by the Pew Research center, published on August 2, 2012, found that 69% of cell phone owners receive unwanted or spam text messages, with 25% of such users receiving spam text messages on at least a weekly basis. *See* http://www.pewinternet.org/Reports/2012/Mobile-phone-problems/Main-findings/Mobile-phone-problems.aspx.

1

On June 26, 2012, the Court granted preliminary approval of the Settlement, (dkt. 55, ¶ 1), blessing the broad Notice Plan set forth in the Settlement as "the best notice practicable under the circumstances" and finding that it complied fully with both Rule 23 and Due Process. (*Id.,* ¶ 10.) The Settlement Administrator has successfully implemented the Notice Plan, and the deadline for submitting requests for exclusion and objections has now expired. There has been an overwhelmingly favorable reaction by members of the Class to the Settlement—no objections have been filed and only thirteen (13) Class Members have requested to be excluded.

This response is not surprising given the exceptional results achieved for the Class through the Settlement. First, each Class Member who received a text message promoting CEC's educational services and who validly submits a short and simple Claim Form by December 7, 2012, will receive up to a $200 settlement payment to be distributed from the $19,999,400 Settlement Fund. This Settlement Fund will also be used to pay administrative expenses, the costs of effectuating proper notice to the Class, incentive awards to the Class Representatives, and attorneys' fees and expenses. In addition, CEC has also agreed to the entry of an injunction prohibiting it, or any agent it hires, from sending text messages without first obtaining prior express consent in writing and maintaining proof of that consent for at least four years.

Although the $200 payments made available to the Class, the lack of objections, and the inherent risk attendant in continued litigation of a complex class action each favor final approval, the Court need not rule on a blank slate in deciding the fairness, reasonableness, and adequacy of this agreement, as it is predicated on similar agreements approved in this District, as well as in federal courts nationally. Accordingly, the Class Representatives respectfully request that this Court grant final approval of the Agreement and dismiss the Released Claims with prejudice.

I.     NATURE OF THE LITIGATION

1.     *The Facts, The Law & The Litigation History*

Final Approval of the instant Settlement Agreement will resolve litigation in two related class actions filed in this District. Each concerns allegations that in the spring of 2008, CEC promoted its International Academy of Design and Technology schools by contracting to send text messages to a list of approximately 100,000 consumers. On August 27, 2008, Plaintiffs Sergio Rojas and Sheila Fahey each received one of these text messages despite allegedly never consenting to receive such messages. Plaintiff Fahey initiated the first class action (the "Related Action")[3] on August 4, 2010, in Illinois state court alleging that the promotional text messages CEC caused to be sent violated the TCPA. CEC's former counsel, however, attempted to moot the entire class action by making an individual "settlement offer" or "pick-off" to Plaintiff Fahey. However, Plaintiff Fahey accepted their offer and Plaintiff Rojas filed a new action in this Court with an accompanying class certification motion preventing further pick-offs. Like Fahey's Related Action, Rojas also pleaded a single cause of action, alleging that CEC's transmission of the unsolicited text message violated the TCPA.

Congress enacted the TCPA to combat the growing threat to privacy being caused by automated telemarketing practices and made it "unlawful to make any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012). The TCPA applies with equal force to the making of text message calls as it does to the making of voice calls to cellular phones. *Lozano v. Twentieth Century Fox,* 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954

---

[3]  Capitalized terms such as "Related Action" have the same definitions as in the Settlement Agreement and refers to *Fahey v. Career Education Corp.,* No. 10-cv-5635 (N.D. Ill.).

(9th Cir. 2009). The TCPA sets statutory damages of $500 per violation and provides for an injunction prohibiting the further transmission of such messages. 47 U.S.C. § 227(b)(3)(A-B).

CEC subsequently removed Fahey's Related Action, where it was assigned to the Honorable James B. Zagel. Once removed, the Parties engaged in several round of motion practice and an evidentiary hearing regarding the individual offer of settlement until the case was stayed. In this case, CEC answered the complaint, denying the substance of Plaintiff Rojas's allegations and setting forth a number of affirmative defenses. (Dkt. 16.) Though Plaintiff Rojas attempted to consolidate his case with that of Fahey's, the Court denied the motion on February 9, 2011 and the Parties began the discovery phase of the litigation. (Dkts. 21, 30.)

During discovery, the Parties propounded several sets of written discovery delving into both the issue of class certification as well as discovery concerning the overall merits of the case. (*See* Declaration of Ryan D. Andrews ("Andrews Decl.") ¶ 4, a true and accurate copy of which is attached as Exhibit 2.) In addition to written discovery, the Parties identified and scheduled the deposition of several key individuals relevant to the action. (*Id.*) It was during this phase of the litigation, after weighing their respective positions, that the Parties reached an agreement to resolve both this litigation and Fahey's Related Action by engaging in a private mediation session with Judge Andersen. (Dkt. 38; Andrews Decl., ¶ 4.)

### 2. *The Mediation & the Settlement Agreement*

Though willing to enter into settlement discussions, the Parties were initially far from compromise. In fact, reaching the Settlement Agreement now before the Court required the Parties to engage in three formal mediation sessions before Judge Andersen. The first occurred on October 18, 2011, during which Class Counsel met with Defendant's counsel and in-house counsel for CEC, with the Parties making significant progress towards settling, but nonetheless

4

leaving the session unable to come to terms on certain issues.  (Andrews Decl., ¶ 4.)  In the wake

of the discussions, the Parties agreed to exchange draft settlement documents to better

understand their respective positions and identify the areas of contention that required additional

discussions.  (Andrews Decl., ¶ 5.)  Acutely aware of the risks and costs of continued litigation,

the Parties returned to a second mediation with Judge Andersen on January 20, 2012, during

which they were ultimately able to come to terms regarding the remaining areas of dispute.

(Andrews Decl., ¶ 6.)  In the subsequent months, the Parties drafted and completed the language

of the settlement, resulting in the Settlement that was preliminary approved by this Court on June

26, 2012.  (Andrews Decl., ¶ 7.; Dkt. 55.)

## II.     TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the

Agreement attached hereto as Exhibit 1 and briefly summarized as follows:

1.     *Class Definition.*  At preliminary approval the Court certified a Class consisting

of all Persons Nationwide who on August 27, 2008, were sent one of two specific text messages

from short code "21021" promoting CEC's International Academy of Design and Technology

schools.  (Dkt. 55; Ex. A, ¶ 1.41.)

2.     *Class Member Payments.*  Each Class Member who submits a valid Claim Form

by December 7, 2012, will get up to a $200 payment from the $19,999,400 Settlement Fund.

However, the Settlement provides for an alternative *pro rata* payment to each Class Member

who submits a valid claim if the total amount of claims, the incentive award, attorneys' fees, and

settlement administration expenses exhausts the Settlement Fund.  (Agreement ¶ 2.1.)

3.     *Injunctive Relief.*  Defendant has also consented to the entry of an injunction for

the next two years, requiring that it, and any agent it hires, refrain from sending any commercial

text messages unless it first receives express written consent from any intended recipients.
Further, the injunction requires CEC to keep proof of all consent obtained for four years.
(Agreement ¶ 2.2.)

    **4.**     *Additional Relief.* In addition to the individual monetary payments and the injunctive relief discussed above, Defendant has also agreed to provide the following relief:

    **A.**     <u>Payment of Notice and Settlement Administration Expenses</u>: CEC has paid from the Settlement Fund the cost of sending the Court-approved notice and will continue to pay all expenses incurred by the Settlement Administrator in processing and paying valid claims as required by the Agreement. (*See* Agreement ¶ 1.34.)

    **B.**     <u>Payment of Attorneys' Fees</u>: While the Parties agreed that Defendant would pay Class Counsel reasonable attorneys' fees and reimburse reasonable expenses for their work in these cases, the Parties initially disagreed as to the amount of the Fee Award. (*See* Agreement ¶¶ 8.1, 8.2.) To achieve finality on the issue—at least among the Parties, as the Court of course has the final determination—they submitted the decision to binding arbitration before Judge Andersen. (*See* Dkt. 60.) Judge Andersen considered submissions from the Parties and concluded that $3,500,000, or 17.5% of the total value of the Settlement Fund, was a reasonable fee. (*Id.*) Thereafter, Plaintiff submitted his Uncontested Motion for Attorney Fees and Incentive Award, which this Court granted on September 6, 2012. (Dkts. 60, 62.)

    **C.**     <u>Incentive Award for Class Representatives and Potential Plaintiffs</u>:
Defendant has agreed, subject to Court approval, to pay Class Representatives Sergio Rojas and Sheila Fahey, and Potential Plaintiffs from the Related Action Lashaye Kimbrough, Joseph Ramirez, and Kathleen McLaughlin, an incentive award of $30,000 to be divided amongst them, in addition to any award they will receive through the Agreement. (*See* Agreement ¶¶ 1.39 &

8.3.)  On September 6, 2012, the Court approved this request.  (Dkt. 62.)

> **D.**     ***Cy Pres***:  The Parties propose that the Coordinated Advice & Referral Program for Legal Services ("CARPLS") be approved as the *cy pres* recipient of all funds that result from settlement checks that are returned or remain un-cashed ninety (90) days after issuance.  CARPLS is a legal aid service that provides legal advice to low-income residents of Cook County.  The organization has offered a multilevel service, including over-the-phone advice, document preparation and review, and referral services for the past 16 years.[4]

> **4.**     ***The Release.***  Should the Court grant final approval to the Agreement, Defendant, its parents, subsidiaries, and independent contractors, and each of their related and affiliated entities, will receive a full release of all claims related to the transmission of Text Messages advertising its products and services to the above-defined Class.  (*See* Agreement ¶¶ 1.29-1.31 & 3.1-3.2 for a description of the complete release language.)

## III.     THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS

Prior to granting final approval to this Settlement, the Court must first consider whether the notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *In re AT&T Mobility Wireless Data Services Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010).  The "best notice practicable" does not require receipt of actual notice by all Class Members in order to comport with both Rule 23 and the requirements of due process however.  Rather, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify the others." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231-32 (S.D. Ill. 2001)

---

[4] CARPLS is a proper *cy pres* recipient of these funds under both federal and Illinois state law, which governs the Parties' Settlement.  *See Glen Ellyn Pharmacy, Inc. v. La Roche-Posay, LLC*, No. 11-C-968, 2012 WL 619595, at *1 (N.D. Ill. Feb. 23, 2012) and 735 ILCS 5/2-807(a)(iv).

(internal citations omitted); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting

that "Rule 23 does not require defendants to exhaust every conceivable method of

identification"). Publication notice is also not limited to print media—the "World Wide Web is

an increasingly important method of communication, and . . . an increasingly important

substitute for newspapers." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004).

The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the

class is reasonable. *Federal Judicial Center, Judges' Class Action Notice and Claims Process*

*Checklist and Plain Language Guide* (2010), p. 3.

The multipart Notice Plan approved by the Court has been fully carried out by

professional settlement administrator The Garden City Group, Inc. ("GCG") and included direct

mail notice, email, print publication, website publication notice, a press release, and online

advertising. (*See* Declaration of Jeanne C. Finegan, APR, ¶¶ 11-18, a true and accurate copy of

which is attached as Exhibit 3.) The direct notice was especially successful, and through a

combination of reverse cellphone look-up searches and addresses supplied to Class Counsel by

the wireless carriers, direct notice was delivered to 80,216 of the 99,997 members of the

Settlement Class. (Finegan Decl. ¶¶ 6-9, 11-13.) This direct mail / email notice was

supplemented with the publication of the Court-approved summary notice in the August 2012

issue of *People Magazine* (with a readership of over 45 million people) and internet banner ads

being placed for a full month through *24/7 Real Media, Univision*, and *Facebook* that generated

over 75 million impressions. (Finegan Decl. ¶¶ 14-15.) Further supplementation was made

through a press release—in both English and Spanish—to *PR Newswire*, which generated 399

news stories about the Settlement. (Finegan Decl. ¶ 16.)

All of the notices, as well as the press release, directed Class Members to the Court-

approved "long form" notice that was posted on www.CareerTextSettlement.net. (Finegan Decl. ¶ 17.) Through this website, Class Members were able to file claims online, print customized claim forms to be mailed to GCG, and review documents filed with the Court in this case. (*Id*.) Since going "live," there have been nearly 33,000 visitors to the website. (*Id*.) All told, the Notice Plan reached over 88% of the Class and, as such, fully satisfies Rule 23 and Due Process. (*See* Finegan Decl. ¶ 22.)

Finally, on June 28, 2012, in compliance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1715 (b), GCG sent via FedEx notice of the Settlement, as well as other required court documents to the Attorney General or other appropriate officials of each state and U.S. territory giving notice of the Settlement Agreement. (Finegan Decl. ¶ 5.)

## IV. THE SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, 07 CV 2898, 2012 WL 651727, *1 (N.D. Ill. Feb. 28, 2012). Even still, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this predisposition towards favoring settlements, the Court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

There is a five-factor analysis that must be employed by the district court to consider the overall fairness of the settlement:

[1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties, [4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp. 2d 935, 958 (N.D. Ill. June 2, 2011). Each factor here militates in favor of final approval.

**1.    *The Strength of the Plaintiff's Case Compared to Settlement Weighs in Favor of Granting Approval.***

The first and foremost consideration in determining the fairness of a settlement is the strength of the plaintiff's case as compared to the overall value of the settlement. *Am. Int'l Group,* 2012 WL 651727, at *2 (citing *Synfuel* 463 F.3d at 653). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Id.* (quoting *Synfuel,* 463 F.3d at 653). However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and "[i]nstead, courts are to provide a ballpark valuation of the class's claims." *Id.* (internal quotations omitted). Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility,* 270 F.R.D. at 347 (internal quotations omitted).

The Class Representatives and Class Counsel believe the merits of the litigation are strong and were likely to succeed on summary judgment or at trial. (Andrews Decl. ¶ 11.) First, the TCPA itself allows for the receipt of "$500 in damages for each such violation," which represents the upper limit of damages from a favorable verdict and sets a statutory cap on the maximum potential recovery for the class at approximately $49 million. *See* 47 U.S.C. §

227(b)(3)(B). Further, courts have addressed and disagreed with a number of affirmative

defenses raised by Defendant in their Answer, including challenges to the constitutionality of the

TCPA as vague or a restriction on free speech, as well as the argument that the offending

messages needed to be sent to randomly or sequentially generated phone numbers; *See e.g.*

*Lozano*, 702 F. Supp. 2d at 1010-11 (rejecting argument that First Amendment requires actual

"use" of an ATDS instead of mere "capacity"); *Abbas v Selling Source, LLC*, No. 09 CV 3413,

2009 WL 4884471, at \*1 (N.D. Ill. 2009) (finding TCPA as applied to text messages does not

violate First Amendment); *Satterfield*, 569 F.3d at 952 (finding a text message to be a "call"

under the TCPA); *Kramer v. Autobytel, Inc*, 759 F. Supp. 2d. 1165, 1171 (N.D. Cal. 2010)

(rejecting vagueness challenge to TCPA text messaging case); *In re Jiffy Lube Int'l, Inc. Text*

*Spam Litig*, 847 F. Supp. 2d 1253, 1256-57 (S.D. Cal. 2012) (rejecting First Amendment

overbreadth challenge to TCPA text messaging class action).

While Class Counsel are confident in the strength of Plaintiff's claims, they are

nevertheless cognizant that "the range of possible outcomes" includes several scenarios that

would result in Class Members receiving nothing. (*See* Andrews Decl., ¶ 11.) Notably, several

of the issues identified above have not been tested in this District and none have been presented

to the Seventh Circuit. Defendant's continued promise to vigorously defend the action through

skilled counsel, the immediate and beneficial relief of establishing a nearly $20 million fund

from which $200 will be provided to each Class Member submitting a claim, as well as the

injunctive relief preventing any unauthorized text messages going forward, all weigh heavily in

favor of granting final approval of the Settlement. *See In re AT&T,* 789 F. Supp. 2d at 961 ("A

dollar recovered today is worth more than a dollar recovered in the future"); *see also Lipuma v.*

*Am. Express Co.,* 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("[I]t has been held proper to take

the bird in hand instead of a prospective flock in the bush.") Thus, weighing the strength of

Plaintiff's claim and the potential risks involved with continued litigation against the exceptional

results for the Class provided by the Agreement, this first factor strongly supports final approval

of the Settlement.

**2.    *The Likelihood of an Increase in the Complexity, Length, and Expense of
Continued Litigation Validates the Approval of the Settlement.***

Final approval of a settlement is favored in cases like the instant one, where "continued

litigation would require resolution of complex issues at considerable expense and would absorb

many days of trial time." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1019 (N.D.

Ill. 2000). There can be no doubt that continued litigation in this case would result in the Parties

incurring further, substantial expenses, including the costs of further discovery, the retention of

expert witnesses, and the filing and briefing of pre-trial motions. And should the case proceed to

trial, evidence and witnesses from across the country would have to be convened, adding

additional expense to the litigation. *See In re AT&T,* 789 F. Supp. 2d at 964 ("The costs

associated with discovery in complex class actions can be significant.") (citations omitted);

(Andrews Decl. ¶ 12.) Given the amount of potential statutory damages at issue and the lack of

Seventh Circuit guidance on several of the relevant issues, the defeated party would certainly

appeal an unfavorable judgment, resulting in greater expenses and a further delay of the final

resolution of this dispute. As such, this factor weighs in favor of approving the Settlement.

**3.    *There Has Been No Opposition to the Settlement.***

Where a settlement has garnered few or no objectors, courts should view this as further

proof that the settlement is fair and reasonable and that class members consider the settlement to

be in their best interest. *Am. Int'l Group*, 2012 WL 651727, at *1. In those cases where there

have been no objectors, or very few in comparison to the total number of class members, courts

12

have considered this to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020-21 (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *AT&T Mobility,* 789 F. Supp. 2d at 964–65 ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object.")

In the instant case not a single Class Member has filed an objection to either the Settlement or the request for fees that was posted to the settlement website, and only a total of 13 out of 99,997 requests for exclusion were received. (Finegan Decl., ¶¶ 19-20.) Throughout the claims process, attorneys and staff at Edelson McGuire spoke with scores of Class Members about the Settlement in exercise of their obligation to the Class. (Andrews Decl. ¶ 10.) Many Class Members expressed their satisfaction with and approval of the Settlement and thanked Class Counsel for bringing the suit, making comments such as:

- "I'm a police officer and I get spammed all the time. Whenever I do, I keep track of the sources and try to fight back because I really hate it. It's great that you guys are out there fighting for me. Good stuff!" *Ronald Y. from IL*
- "I get garbage texts all the time and am always trying to find a way to combat them. I look up the corporate offices of the companies that send them and always wished someone would do what you're doing. Thank you so much for your time and methods of going about this." *Christina S. from TX*

(Andrews Decl. ¶ 10.) The complete absence of objectors, coupled with the positive responses received to the Settlement, further supports granting final approval of the Settlement.

### 4.    *The Opinion of Competent Counsel Favors Approval.*

"The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 F. Supp. 2d at 586. This is especially true where Class Counsel are qualified, where discovery and settlement negotiations are extensive and thorough, and where there is no indication of collusion. *Id.*; *see also Hispanics*

*United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

Class Counsel specialize in litigating consumer class actions and have pioneered the application of the TCPA to emerging text-messaging technology. (Andrews Decl. ¶ 8.) While familiar with the issues involved in a TCPA text-messaging class action, Class Counsel were nevertheless pitted against highly-experienced defense counsel who promised to continue to mount a formidable defense. (Andrews Decl. ¶ 11.) Arriving at a Settlement in this case required extensive—and at times heated—negotiations in multiple mediation sessions with Judge Andersen, which were conducted only after having nearly completed discovery. (Andrews Decl. ¶¶ 4-7; 9.) Thus, faced with the prospect of receiving nothing should CEC succeed in any aspect of its defense, Class Counsel are confident based on the information in their possession that payment of $200 per Class Member is an exceptional result in this litigation. (*See* Andrews Decl. ¶ 12.)

     **5.**      ***The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement.***

The fifth factor concerning the stage of the proceedings is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,* 616 F.2d 305, 325 (7th Cir.1980), overruled on other grounds by *Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998). Approval of a settlement does not hinge on the amount of formal discovery conducted by the Parties; instead "the pertinent inquiry is what facts and information have been provided." *Schulte,* 805 F.Supp.2d at 587 (quoting *In re AT&T* 789 F. Supp. 2d at 967.); *see also Isby*, 75 F.3d at 1200 (approving a

settlement where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough.")

The Parties only attempted to resolve the instant matter through mediation with Judge Andersen just prior to the conclusion of the discovery period and with key depositions scheduled. (Andrews Decl., ¶ 4.) As such, the Parties entered the mediation process with the benefit of having conducted sufficient written discovery and third-party discovery to fully understand their relative positions and negotiate effectively. (Andrews Decl., ¶ 4.) Further, the settlement discussions, months of negotiations, and multiple mediation sessions allowed Counsel more than sufficient opportunity to fully explore the merits of litigation and reach a settlement that reflected the perceived strengths and weaknesses of the case. (Andrews Decl. ¶ 9.) Given the stage of the proceedings and the amount of discovery exchanged by the Parties, this final factor weighs in favor of approval. With this final *Synfuel* factor satisfied, the result supports a finding that the Settlement is fair, reasonable, and adequate, and deserving of final approval.[5]

## CONCLUSION

For the foregoing reasons, Plaintiff Sergio Rojas respectfully requests that the Court grant final approval to the Settlement Agreement. A Proposed Order shall be separately submitted by email for the Court's consideration in advance of the October 23, 2012, final fairness hearing.

---

[5] A comparison to similar class action settlements in this District and others further supports a finding of fairness, reasonableness, and adequacy of the instant Settlement. *See*, *e.g.*, *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344 (N.D. Ill.) (approving settlement creating a $16 million settlement fund for the transmission of 98,000 text messages, entitling each class member to a $200 settlement payment); *Weinstein v. The Timberland Co. et al.*, No. 06-cv-00484 (N.D. Ill.) (approving settlement creating a $7 million settlement fund for the transmission of 40,000 text messages, entitling each class member to a $150 settlement payment); *Satterfield v. Simon & Schuster, Inc. et al.*, No. 06-cv-02893-CW (N.D. Cal.) (approving settlement creating a $10 million settlement fund for the transmission of 59,000 text messages, entitling each class member to a $175 settlement payment).

Dated: October 9, 2012                    Respectfully submitted,

                                          **SERGIO ROJAS**, *individually and on behalf of a*
                                          *class of similarly situated individuals*


                                          __/s/ Ryan D. Andrews_____  _____
                                          Counsel for Plaintiff and the Class


Jay Edelson
Myles McGuire
Ryan D. Andrews
Edelson McGuire, LLC
350 North LaSalle Street, 13th Fl.
Chicago, Illinois 60654
Telephone: 312.589.6370
Facsimile: 312.589.6378
randrews@edelson.com

## CERTIFICATE OF SERVICE

I, Ryan D. Andrews, an attorney, certify that on October 9, 2012, I served the above and foregoing *Plaintiff's Uncontested Motion & Memorandum in Support of Final Approval of Class Action Settlement* by causing true and accurate copies of such paper to be filed and transmitted to the persons shown below via the Court's CM/ECF electronic filing system.

Christopher B. Wilson
Patrick M. Collins
Debra Rae Bernard
Perkins Coie, LLC
131 S. Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559
Telephone: 312.324.8603
Facsimile: 312.324.9603
cwilson@perkinscoie.com
pcollins@perkinscoie.com
dbernard@perkinscoie.com


    /s/ Ryan D. Andrews
Ryan D. Andrews